IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHAD ERNST MULLENS,

      Plaintiff,

v.

ADAMS COUNTY GOVERNMENT
and ADAMS COUNTY SOLID WASTE
DEPT.,

      Defendants.

OPINION AND ORDER

Case No. 18-cv-808-wmc

---

*Pro se* plaintiff Chad Mullens is proceeding in this lawsuit against defendants Adams County and the Adams County Solid Waste Department on claims under Title VII of the Civil Rights Act of 1964. Mullens worked for the Adams County Solid Waste Department from 2005 to 2017. He claims that between 2016 and June of 2017, when his employment with the Solid Waste Department ended, he was subjected to harassment on the basis of race and sex, and ultimately terminated in retaliation for engaging in protected conduct. Currently before the court is defendants' motion for summary judgment. (Dkt. #23.) Because the undisputed evidence does not permit a reasonable fact-finder finding in Mullens' favor on any of his claims, the court will grant defendants' motion.

UNDISPUTED FACTS[1]

## A. Parties

Plaintiff Chad Ernst Mullens is a white male who currently resides in Friendship, Wisconsin. The Adams County's Solid Waste Department is a sub-unit of and wholly managed by Adams County ("the County"). The Solid Waste Department has approximately twenty full-time employees, but it also uses temporary employees hired through a temp agency on an as-needed basis. During the relevant time period, all Solid Waste Department employees were white, except for one African American employee who worked in the Solid Waste Department from 2005 until his retirement in August of 2016. Additionally, the majority of the Solid Waste Department employees are male. During the relevant period, the only females were Brenda Quinnell, the Director of the Solid Waste Department, and two or three office staff members.

## B. Mullens' Employment

Mullens began working for the County's Solid Waste Department on a part-time basis in 2001, and on February 9, 2004, he became a full-time employee. He continued full time employment with the Solid Waste Department until June 1, 2017. Mullens' primary duties included operating heavy machinery, driving routes and performing maintenance.

During his employment, Mullens periodically received copies of Adams County's Employee Handbook, which contained the County's policies and procedures related to how

---

[1] The court has drawn the following facts from the parties' proposed findings of fact and responses, along with the underlying evidence as necessary, while viewing the record in a light most favorable to plaintiff as the non-moving party.

employees request leave.[2]  If a Solid Waste Employees wished to take time off, he or she was required to obtain authorization from Director Quinnell.  In addition, certain supervisors were able to allow employees to take time off, but only if authorized by Quinnell.

In 2017, Mullens had two supervisors, Henry ("Hank") Strohmeyer and Billy Armstrong.[3]  During the relevant time period, Hank Strohmeyer's position was Daily Operations Foreman, meaning that he was second-in-command to the Solid Waste Department Director Quinnell.  Armstrong, who is married to Mullens' sister, was Mullens' Shop Supervisor, but was not authorized by Quinnell to grant Solid Waste Employees time off.[4]

### C. Evidence Related to Racial Discrimination Claim

Mullens claims that the County discriminated against him based on his "racial association," by which he means his association as a white man with African Americans.  Specifically, he claims that on multiple occasions, Andy Strohmeyer, a co-worker who is also white, called him a racially derogatory name (the "N-word"), and management did

---

[2] In at least 2010 and 2012, Mullens signed a form acknowledging his receipt of this handbook.

[3] Since Hank's son, Andy Strohmeyer is also an Adams County employee, as described below, the court will generally refer to the two Strohmeyers by their first names, Hank and Andy.

[4] While Mullens purports to dispute this fact, he references an instance on May 18, 2017, which will be described in more detail below.  Mullens simply left work because Director Quinnell was busy when Mullens sought permission to leave.  This fact, even if true, does not create a genuine dispute, since it indicates that Mullens attempted to obtain Quinnell's approval consistent with policy, rather than that Armstrong was authorized to allow *or* allowed him to leave without obtaining Quinnell's approval.

nothing to address that name calling.  In his deposition, Mullens described Andy's use of the word as follows:

> [That's] what I was called multiple times from Andrew Strohmeyer.  And that word was also attached to go get this, and that word.  And you are my – and so on and so forth.  I need this.  And yeah, that word he used towards me – as a direction of however he felt he needed to use that.  For whatever reason, he felt he needed to use that word.

(Mullens Dep. (dkt. #24) 67:7-14.)  Mullens also claims that he heard Andy call Bill Armstrong, also a white male, the N-word as well.

Although Mullens does not know *why* Andy called him or others the N-word, Mullens points out that he has African American friends, and he is State certified to provide foster care where there are African Americans in the foster care system.  While he testified about this background information in his deposition, however, Mullens neither suggests nor offers evidence that any Adams County employee *knew* about any of his relationships with African Americans, including Andy.  Rather, his discrimination claim in this lawsuit relates only to Andy's offensive use of the N-word.

At the end of August 2016, an incident occurred between Mullens and Andy. Apparently Andy believed that Mullens was trying to irritate him by moving his chairs and tools, as well as closing the shop door on him.  When Andy found a hose sitting on his chair in the shop, he became angry and threw the hose in Mullens' direction.  According to Mullens, as Andy walked out, he then said "what the fuck are you going to do about it?"  (Mullens Dep. (dkt. #24) 87).)  Mullens also claims that on another occasion Andy threw mice pellets at him.

Following this particular incident, Director Quinnell talked to Andy and Mullens separately. Quinnell then gave Andy a "verbal warning" for his physical and verbal outburst, also indicating that she would consult with a human resources employee about it. While none of the contemporaneous documentation related to this incident and warning suggests that Mullens reported Andy's use of any derogatory names, including the "N-word," Mullens testified in his deposition that at some point, he told his Shop Supervisor Hank Strohmeyer about Andy's use of the N-word and other names Andy called him, to which Hank replied Mullens that Andy was just having "a bad day." (Mullens Dep. (dkt. #24) 69.) On one occasion, Mullens responded by demanding not to work around Andy anymore.

Mullens also claims that in 2016, possibly in September or October, Hank twice threatened to fire Mullens. Mullens testified that he did not know why Hank threatened to fire him and does not provide specific details about those interactions. Hank apparently changed his mind, however, since Mullens was not only not fired, but was no longer required to work near Andy.

### D. Evidence Related to Sex Discrimination Claim

Almost ten months later, on May 18, 2017, Mullens got into another verbal dispute with a co-worker, this time with John Marlowe, who Mullens had known for twenty years. Almost a year before this incident, Mullens had found two pairs of novelty handcuffs, and he suspected that Marlowe took one of the pairs because they were metal and, therefore, Marlowe believed illegal. On May 18, Mullens confronted Marlowe about the handcuffs, telling Marlowe to return them. According to Mullens, Marlowe then responded, "I don't

have them.  Why don't you go use them on those kids."  (Mullens Dep. (dkt. #24) 153, 163.)  When Mullens asked Marlowe who he was talking about, Marlowe responded, "Take the boy upstairs, and use the cuffs on him."  (*Id.* at 153, 164.)  The two proceeded to exchange heated words, calling each other "fucking sick" in the process.  (*Id.* at 168.)

Before this happened, Mullens and Marlowe had apparently had no animosity for each other.  While Mullens still does not know exactly to what Marlowe was referring when he made the statements about kids, Mullens believes that Marlowe's comments were sexually suggestive.  This is the only incident Mullens cites as evidence that he was discriminated against on the basis of his sex.

Mullens' Shop Supervisor, Armstrong, was present for the incident between Mullens and Marlow, but Armstrong avers that he did not pay close attention to what they were saying to each other as he was working on a hose.  Mullens disputes this fact, pointing to Marlowe's description of this event, in which he recounts that Armstrong apparently looked like he could not believe what Mullens was saying.  (Marlowe Decl. (dkt. #24) ¶ 4, Ex. 1.)  Of course, this statement does not directly dispute Armstrong's averment that, while he was aware of the dispute and perhaps looked befuddled by it, he may still not have heard what Marlowe and Mullens were saying to each other.

Following the incident, Quinnell asked Marlowe to prepare a written statement, in which he admitted exchanging vulgarities with Mullens, writing:  "The 'vulgar' statements I made on May 18, 2017 to Chad Mullens were the first things that came to my head in the heat of the moment.  I did not mean anything sexual by it.  They were toy handcuffs." (Marlowe Decl. (dkt. #27) ¶ 9.)

Mullens claims that immediately after their argument, he asked Armstrong if he could leave work. Mullens claims that Armstrong responded "Yeah go ahead, I don't blame you." (Mullens Dep (dkt. #24) 153, 171.) Armstrong believes that Mullens did not actually ask him permission to leave, but rather simply stated that he was leaving. (Armstrong Decl. (dkt. #25) ¶ 14.) Before leaving that day, however, Mullens attempted to contact Director Quinnell as well, but because she was busy, the two did not talk that day.

Mullens later sent Quinnell a text message telling her that he had left work at 10:30 and reporting that Armstrong said it was okay for him to leave. Mullens added that he wanted to file a harassment charge against Marlowe. That same day, Quinnell responded in a text, writing "I will check into it and get back to you." (Mullens Dep. (dkt. #24) 176.)

Later that day, Quinnell spoke with the then County Human Resources Director, Marcia Kaye, asking how she should respond to Mullens' desire to file a complaint. Kaye told Quinnell that Mullens and Marlowe should each write down their accounts of the incident, which Quinnell could then forward to the County's corporation counsel to review. Accordingly, Quinnell sent Mullens a text later that day, directing Mullens to write everything about his complaint down and bring it to her, and she would forward it to corporation counsel. A few hours later, Quinnell met with Marlowe and directed him to do the same thing.

On Friday May 19, 2017, Mullens called into the Solid Waste Department, telling a secretary that he would not be coming and she could mark him as using vacation time that day. Although not coming into work, Mullens also dropped off his written complaint

that day, with Quinnell, detailing what happened with Marlowe the day before. In his complaint, Mullens specifically asked for (1) his handcuffs back and (2) an explanation from Marlowe as to what he meant by using the terms "kids" and "boy." (*See* Mullens Dep. Ex. 7 (dkt. #26-9); dkt. #35-1, 2-3.)

On Monday May 22, 2017, Mullens again called into the Solid Waste Department and informed staff that he would not be coming in that day and would use vacation or comp time to cover this absence as well. Mullens did the same thing the next two days. At that time, the policy in the Solid Waste Department was that employees were allowed to use vacation or comp time at the last minute if workloads permitted and if employees used no more than a few days in a row. When Mullens was taking this time off, however, the Solid Waste Department was busy and short-staffed.

While Mullens was paid for May 19, 22, 23 and 24, Director Quinnell reached out to Mullens on May 24th via text message, writing that she wanted to meet with him in her office the next morning at 8:30 a.m. By the next morning, May 25, 2017, Quinnell still had not received a response from Mullens, so Quinnell asked that the Solid Waste Department secretaries tell Mullens to call her home phone should he call into the office. Mullens called at around 7 a.m. that same morning, and he was told to call Quinnell. After the two exchanged a few text messages about meeting, Mullens arrived at the office at about 8:30 a.m. that morning to meet with Quinnell and the officer manager of the Solid Waste Department, Shennel Parr.

During their May 25 meeting, Director Quinnell told Mullens that she spoke with the County Human Resources Director and corporation counsel, who both determined

that the May 18, 2017, incident with Marlowe did not meet the standards for harassment. In particular, Mullens claims Quinnell said, "[t]here was no harassment; there's nothing." (Mullens Dep. (dkt. #24) 202.) Mullens responded by giving Quinnell a piece of paper with a name and phone number on it and telling her to contact his attorney, at which point Mullens left her office and the building. As he was leaving, Quinnell yelled after him that he was no longer authorized to be off work and needed to return. While acknowledging that he heard Quinnell yell, Mullen maintains that he did not hear her tell him to return to work.

### E. Mullens Ends his Employment

After the May 25 meeting, when Quinnell told Mullens that his complaint about Marlowe did not constitute harassment, Mullens never returned to work, stopped calling in and did not request a leave of absence. On June 4, 2017, Quinnell sent Mullens a letter via certified mail, informing Mullens that because he had not shown up for work, called in or contacted her since their meeting, Mullens was considered to have voluntarily abandoned his employment with the Solid Waste Department, effective June 1, 2017. Mullens purports to dispute this fact, pointing out fact that Quinnell subsequently wrote in an email to the former Adams County Sheriff that "We terminated Chad Mullens." (*See* Ex. Z10 (dkt. #36-1 at 50.) However, Mullens does not dispute the content of Quinnell's June 4th letter to Mullens that he "voluntarily abandoned" his employment, effective June 1st, nor that he received the letter on June 6, 2017.

On June 12, 2017, Quinnell also sent Mullens a text message asking to set up a time to meet so that Quinnell could collect certain items from him.  On June 16, Mullens received his final paycheck that included a payment for accrued but unused comp time.

A week later, when Director Quinnell had not heard back from Mullens, she sent another text, again asking to set up a time to meet, adding that they could arrange for Mullens to leave the items somewhere other than the office, if he preferred.  On June 23, 2017, Mullens came to the Solid Waste Department and turned in his badge and door key to Quinnell.

### F.  Other Claimed Harassment

Mullens also claims he witnessed other employees being victimized and harassed on the job.  For example, a temporary worker named Lester Kolbe worked at the Solid Waste Department from June 16 to December 20, 2016.  According to Mullens, Kolbe was repeatedly harassed, referred to as "Chester the Molester," and one of his co-workers, Chad Peterson, threatened to beat him up.  Mullens also describes an incident with a second temporary worker named Jordan Edwards, who Peterson also threatened to beat up.  Edwards was employed at the Solid Waste Department from May 16, 2016, to August 5, 2016.

Mullens claims that Peterson also threatened to beat him up.  According to Daily Operations Foreman Billy Armstrong, Peterson frequently "joked" that he would "beat" other employees' asses, although it is unclear why this was tolerated.  (Armstrong Decl. (dkt. #25) ¶ 12.)  Regardless, Mullens does not know *why* Peterson threatened him, but he believes that the threat Peterson made towards him was not made in a joking manner.

At some unspecified time, Mullens also claims that Shop Supervisor Armstrong punched him in the stomach and threw him into a wall near where employees used timecards to punch in and out of work. Mullens does not know why Armstrong did this. As for Billy Armstrong, he recalled an incident from over seven years ago when he and Mullens were goofing around and Mullens lost his balance and his elbow put a hole in the drywall. Defendants suggest that this incident happened before February 5, 2017, since the Solid Waste Department switched from paper timecards to digital timekeeping on that date.[5]

Finally, Mullens claims that Director Quinnell threatened and harassed him by telling him he was "not flexible enough," and insinuating he might be terminated. Apparently, this conversation occurred in September 2016, after Mullens had been in the hospital. However, during his deposition, Mullens declined to testify whether any of these other alleged incidents of harassment occurred because of his sex or race. Instead, he suggested that the County should have asked those individuals why they did what they did.

## OPINION

Defendants seek judgment in their favor on the merits of Mullens' discrimination and retaliation claims.[6] Summary judgment is appropriate if the moving party shows "there

---

[5] Mullens similarly claims that Tom Pokszyk, yet another co-worker, harassed him by following him while he was on a truck route and taking photographs of him. Again, Mullens does not know why Pokzyk did that, nor is it clear *when* this occurred.

[6] Defendants also seek judgment on Mullen's racial association claim as untimely. Since the evidence of record clearly does not support that claim on the merits, the court need not resolve this argument.

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported by only speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). "As the put up or shut up moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citations omitted).

Here, plaintiff Mullens claims he was discriminated against both on the basis of his race and sex, as a white male. Mullens claims that the County discharged him in retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, although when specifically asked during his deposition what protected activity he engaged in, Mullens responded, "The protected activity would be my job." (Mullens Dep. (dkt.

#24) 220.) For the reasons that follow, plaintiff has failed to meet his burden of proof as to any of these claims.[7]

## I. Harassment Based on Racial Association and Sex

Mullens principally claims that co-workers Andy Strohmeyer's and John Marlowe's acts of harassment amounted to discrimination on the basis of his race and sex in violation of Title VII of the Civil Rights Act of 1964. Title VII prohibits an employer from discriminating based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "Subjecting an employee to a hostile work environment counts as an adverse action ('unlawful employment practice') within the meaning of Title VII's prohibition of race discrimination in 42 U.S.C. § 2000e-2(a)." *Gates v. Bd. of Education of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019) (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)).

A plaintiff must establish four elements to avoid summary judgment on a hostile work environment claim: "(1) the work environment must have been both subjectively and objectively offensive; (2) [his] gender [or race] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) (quoting *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014)); *Gates v. Board of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019). As to the third element, the harassing conduct

---

[7] Mullens further claims that Quinnell did not accurately report and document his employment. When asked about inaccuracies in his deposition, however, Mullens was unable to give specifics, merely stating that there were inaccuracies in how events were described, and he would need to review every word of his 288-page employee file to provide specifics. However, this assertion is insufficient to state a specific claim for relief.

need not be *both* severe and pervasive; one incident of conduct that is sufficiently severe may be enough to constitute a hostile work environment. *Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 601 (7th Cir. 2014) (citing *Jackson v. Cty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007); *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678 (7th Cir. 2001)). Where plaintiff's real failure of proof lies, however, is as to causation under the second element of his claim to a hostile work environment.

### A. Race

Starting with Mullens' race-based harassment, his claim poses an initial, unresolved question in this circuit: whether an employee may bring a Title VII claim based on racial association. *Ineichen v. Ameritech*, 410 F.3d 956, 961-62 (7th Cir. 2005) ("This court has not yet definitively ruled on whether discriminating against a person because they are involved in an interracial relationship constitutes race discrimination in violation of Title VII."); *see Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 883-86 (7th Cir. 1998) (accepting that employee may be able to bring an associational race discrimination claim, but only insofar as discrimination is because of the plaintiff's race). While the Seventh Circuit has not specifically recognized a discrimination claim on this basis, the court has suggested that "the key inquiries should be whether the employee has been discriminated against and whether that discrimination was 'because of' the employee's race." *Drake*, 134 F.3d at 884. In *Drake*, a white plaintiff maintained that (1) he was good friends with multiple, black co-workers, and (2) had filed a grievance against a white co-worker. *Id.* at 881. Afterwards, the white co-worker allegedly confronted the plaintiff, telling him to put his nose "up the black's ass like you have always got it and keep it there." *Id.* at 882.

However, the Seventh Circuit concluded that the plaintiff failed to state a hostile work environment claim because he had "not established an inference that any harassment to which he was subjected was based on *his* race, in conjunction with his association with [his black co-workers]." *Id.* at 884 (emphasis added). Elaborating on the severity of the alleged harassment, the court also added that the one comment was not so significant as to support a hostile environment claim. *Id.* at 885.

Applying the general guidance from *Drake* here, the court cannot conclude that Mullens' experiences afford him protection under Title VII. First, unlike in *Drake*, Mullens' allegations are vague and not racially charged. On the contrary, he suggests that his experience with another white coworker, Andy Strohmeyer, amounted to racial harassment because he takes significant personal offense to the use of the N-word, in part because of his personal relationship with blacks outside of work and because of his opinion that the N-word should simply not be uttered. While defendants concede Mullens' view that Andy's use of the N-word was highly inappropriate and worthy of complaint, they point out that it does not follow that *Mullens*' was subjected to a hostile work environment on the basis of *his* race. The court agrees.

Moreover, again unlike *Drake*, there is no evidence of record suggesting that Andy made the statements, however offensive, *because* Mullens had a particular relationship with a black person in or out of work. Indeed, there is no evidence of record indicating that Andy knew about *any* of Mullens' alleged personal relationships with black people, all of which took place outside of work. Furthermore, the claimed animosity between Mullens and Andy was related to the friction between them *in* the workplace: Andy believed that

Mullens was trying to get under his skin by moving his tools and closing a garage door on him, and Mullens believed that Andy threw a hose at him. In these circumstances, in which there is *no evidence* that Andy's animosity towards Mullens had anything to do with Mullens' association with any minority person, it would be unreasonable to infer that Andy's alleged harassment was *because of Mullens'* racial association, however much Andy's specific remarks would have racial overtones in a different setting.

Finally, even if Mullens could establish a racial association claim, it would still fail on this record since no reasonable trier of fact could agree that Andy's specific use of the N-word was sufficiently pervasive or severe to amount to a hostile work environment. There is no question that the use of the N-word is uniquely and patently offensive. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) ("Given American history, we recognize that the word . . . can have a highly disturbing impact on the listener."). Yet the question is whether Andy's use of that word -- in calling a white man, Mullens, the N-word or in saying it to another white man, Armstrong, with no black person present -- was so severe and/or pervasive to alter the conditions of *Mullens'* work environment. On these limited facts, the answer is no.

First, Andy was Mullens' co-worker and not a supervisor, a significant distinction in evaluating the objective offensiveness of the use of the N-word. The Seventh Circuit recently reiterated that it has "treated a supervisor's use of racially toxic language in the workplace as much more serious than a co-workers." *Gates*, 916 F.3d at 638 (citing *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018)). Indeed, while on several occasions the Seventh Circuit has affirmed a district court's conclusion that the use of racial epithets

by co-workers was not sufficiently severe or pervasive to establish a hostile work environment, the court has reached the opposite conclusion when a *supervisor* uses similar language, in particular, when the supervisor directs that language at the plaintiff. *Compare Nichols*, 755 F.3d at 601 (affirming summary judgment for employer since one use of racial epithet and several other incidents of harassment by co-workers, were not severe or pervasive enough) *and Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 562 n.2, 566-67 (7th Cir. 2004) (affirming summary judgment on one hostile environment claim where plaintiff heard defendant, who may have been her supervisor, utter one racist comment not directed at her) *with Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (multiple instances of supervisor using the N-word in employees' presence established actionable hostile work environment) *and Shanoff v. Illinois Dep't of Human Servs.*, 258 F.3d 696, 698-99, 705-06 (7th Cir. 2001) (hostile work environment should have gone to trial where plaintiff's supervisor repeatedly harassed him with derogatory comments about his race and religion).

Second, the evidence of record does not allow a reasonable inference that Andy called Mullens by that name consistently or in a threatening manner. As a result, a reasonable jury could not conclude that Andy's use of the N-word around Mullens created a hostile work environment. Indeed, even when the plaintiff was black in otherwise similar circumstances, the Seventh Circuit has held that the use of the N-word by a coworker did not constitute a hostile work environment. *See Nichols*, 755 F.3d at 601 (citing *Smith v. N.E. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) ("the mere utterance of an . . . epithet which engenders offensive feelings in an employee" does not necessarily violated Title VII).

Accordingly, the court concludes that no reasonable trier of fact could conclude that Mullens was subjected to a hostile work environment on the basis of his race *or* his racial association, and defendants are entitled to summary judgment on Mullens' racial discrimination claim.

### B. Sex

If anything, Mullens' harassment claim on the basis of sex stands on even shakier ground. The only incident Mullens points to in support of his sexual discrimination claim is his May 18, 2017, altercation with Marlowe, another male coworker. Marlowe's statements, telling Mullens to use his handcuffs on "kids" or "boys" were not overtly sexual, and the Seventh Circuit has held that innuendo is not severe enough to be actionable under Title VII. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002) ("isolated and minor incidents of questionable conduct generally will not warrant a conclusion of sexual harassment"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) ("occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers" does not generally amount to a hostile work environment). Even considering Mullens' apparent interpretation of their exchange -- that Marlowe was implying Mullens had sexual relationship with boys or kids -- it would not be reasonable for a jury to infer that the statements were made because of Mullens' *sex* or even sexual orientation, but rather because he was a child sexual predator. While one could hardly conceive of a more offensive suggestion, the offensiveness does not by itself make it actionable under Title VII.

Although far less offensive, the Seventh Circuit's conclusion in *Lord v. High Voltage Software, Inc.*, 839 F.3d 556 (7th Cir. 2016), supports this same conclusion. *Id.* at 361. In

*Lord*, a male plaintiff brought a sexual harassment complaint against male co-workers who teased the plaintiff about having a sexual relationship with a female co-worker. *Id.* The court rejected the sexual harassment claim, reasoning that "[s]ame-sex harassment claims are cognizable under Title VII provided that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted *discrimination* because of sex." *Id.* The court reasoned that inferences of discrimination due to sex are more obviously drawn in circumstances of opposite-sex harassment or same-sex harassment by an individual who is same-sex oriented. *Id.* None of those things is present on this record. In particular, there is no suggestion that Marlowe nor Mullens are same-sex oriented, and Marlowe's comments, as Mullens himself describes them, were not overtly related to the fact that Mullens is a man, but only hinted at him having sexual encounters with minors. However much this innuendo is offensive and unwelcome, no reasonable trier of fact could conclude that Marlowe's comments about Mullens' use of the handcuffs on boys or kids was harassment based on Mullens' sex.

In any event, the exchange with Marlowe was a single, isolated incident, and it stands in stark contrast to other hostile work environment claims that have been allowed to proceed past summary judgment because of its pervasiveness and relationship to the plaintiff's sex. *Compare Orton-Bell*, 759 F.3d at 775-76 (reversing summary judgment on hostile work environment claim based on evidence of a "constant barrage of sexually charged comments . . . clearly pervasive, offensive, and based on [plaintiff's] sex," such that there was "enough evidence for a jury to find that it was severe, subjectively offensive"), *and Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 786 (7th Cir. 2007) (reversing

summary judgment for employer when plaintiff dealt with 18 sex-based comments over ten months), *with Yuknis v. First Student, Inc.*, 481 F.3d 552, 553 (7th Cir. 2007) (explaining that a plaintiff cannot establish a hostile work environment claim where "'the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of her sex.'" (quoting *Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996))).

Finally, this was again the single act of a coworker, in which at most the Solid Waste Department Director Quinnell might have been faulted for not taking more seriously. But given the fact that she investigated this seemingly isolated incidence, and allowed plaintiff a week to recover his bearings, it is hard to see how any reasonable jury could fault the County for its response on this record. Accordingly, the court concludes that defendants are also entitled to judgment in their favor on Mullens' sex discrimination claim.

### C. Other Harassment

While Mullens' complaints about other isolated harassment incidents by multiple coworkers, including in one case each, by Director Quinnell and Shop Supervisory Armstrong, none support a claim under Title VII. Again, Title VII is an anti-discrimination status, not an anti-harassment statute. *Smith v. Rosebud Farm, Inc.*, 898 F.3d 747, 752 (7th Cir. 2018). Nor is it a general civility statute. *Oncale v. Sundowner Offshore Servs., Inc.*, 118 S. Ct. 998, 1002-03 (1998).

Certainly, Mullens testified to isolated, unrelated incidents about other employees' arguably inappropriate behavior. Specifically, Mullens claims that: his Shop Supervisor Armstrong punched him in the stomach and threw him against a wall; Operations Forman

Strohmeyer threatened to fire him; coworker Peterson threatened to assault him; coworker Pokszyk followed him and took photographs of him; and Director Quinnell threatened him, failed to document his employment accurately and told him he was not "flexible" in performing his job.  Mullens also complains about the alleged harassment by still *other* coworkers, Lester Kolbe and Jordan Edwardson.  Yet Mullens has provided *zero* evidence that he was being mistreated by any of these coworkers on the basis of his race, sex or membership in *any* other protected class.  Accordingly, no reasonable trier of fact could find that Mullens was subjected to a hostile work environment on the basis of a class protected by Title VII, and defendants are entitled to summary judgment on Mullens' Title VII discrimination claims.

## II.     Retaliation

Finally, to avoid summary judgment on his retaliation claim, Mullens must submit evidence that he "(1) opposed an unlawful employment practice under Title VII; (2) was the object of an adverse employment action; and (3) the adverse employment action was caused by [his] opposition to the unlawful employment practice." *Congleton v. Oneida Cty.*, No. 16-cv-412-wmc, 2017 WL 4621117, at *16 (W.D. Wis. Oct. 13, 2017) (citing *Cullom v. Brown*, 209 F.3d 1035, 1040 (7th Cir. 2000)).  This case falls on the first of these elements alone, since plaintiff provides no evidence from which a reasonable trier of fact could conclude that he complained about discrimination based on his membership in a protected class.  *Orton-Bell*, 759 F.3d at 776 (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)) (affirming summary judgment on retaliation claim where plaintiff failed to link complaint to protected status as a woman, such that complaint could

not be basis for retaliation claim).  Instead, Mullens actually testified in his deposition that his "protected activity" was his job, but this is not protected activity.  Rather, "an employee engages in protected activity by either:  (1) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice." *Northington v. H&M Intern.*, 712 F.3d 1062, 1065 (7th Cir. 2013).

Even assuming Mullens meant his protected activity to be his complaint about Marlowe's statements following the missing handcuffs, defendants further argue that his complaint still does not constitute protected activity under Title VII, and indeed, there was no suggestion -- explicit or implicit -- in Mullens' complaint about Marlowe's statements to him causing even Mullens to believe that he was being harassed or discriminated against because of his sex.

Rather, as discussed above, the *most* that could be inferred from Mullens' complaints to defendants about Marlowe's statements is they amounted to sexual innuendo that he might be a child molester, *not* that Marlowe was harassing him because he was a man. Therefore, as in *Lord*, Mullens' alleged complaint about those statements does not constitute protected activity.  839 F.3d at 563 (agreeing that a plaintiff's complaints about a male co-worker's comments suggesting that plaintiff had sex with a female co-worker "did not amount to protected activity because they did not concern the type of conduct that Title VII prohibits").

As for the causation element, defendants argue that Mullens' termination was caused by his decision to leave his position voluntarily.  Indeed, it appears that there is no

reasonable dispute that Mullens stopped showing up for a work *and* failed to respond to Director Quinnell's communications about his lack of attendance, even when it became obvious that he was doing so without defendants' consent. Specifically, the record establishes that between May 25 and the beginning of June of 2017, Mullens neither went to work nor did he request to take annual, sick or personal leave. While for a few days after the May 18, incident Mullens reached out to staff *daily* to request to take annual leave for his absence, those communications stopped altogether on May 25, when Mullens finally agreed to meet with Quinnell. Therefore, the overwhelming evidence of record shows that Quinnell's June 4 explanation for his termination was his absence from work, *not* his complaint about Marlowe. Given that Mullens does not dispute that he neither appeared for work nor requested to take leave after May 25, no reasonable trier of fact could conclude that Mullens was terminated because of his complaints about Marlowe.

Finally, to the extent Mullens would argue that he was constructively discharged *before* he stopped appearing for work, the record simply does not support such a finding. To establish a constructive discharge claim, a plaintiff "must prove that [her] working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into voluntary resignation." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (citing *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 517 (7th Cir. 1996)). Mullens cannot make that showing here because "[w]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment; 'in the "'ordinary'" case, an employee is expected to remain employed while seeking redress.'" *Id.* (quoting *Drake v. Minnesota Mining & Mfg. Co.*, 134

F.3d 878, 886 (7th Cir. 1998)). Since the evidence of record does not support a finding that Mullens was subjected to a hostile work environment, it follows that he was not, at any point, constructively discharged from his employment.

Since no reasonable trier of fact could find in Mullens' favor on any of his claim, defendants' motion for summary judgment will be granted.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #23) is GRANTED.

2) Plaintiff Chad Mullens' motion for extension (dkt. #44) is DENIED as moot.

3) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 6th day of January, 2020.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge